UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| BRANDY K. SAMUEL,<br><br>            Plaintiff,<br><br>      vs.<br><br>CAROLYN W. COLVIN, Acting Commissioner of the Social Security Administration,<br><br>            Defendant. | No. 1:13-cv-00760-LJM-MJD |

## **ENTRY ON JUDICIAL REVIEW**

Plaintiff Brandy K. Samuel ("Samuel") requests judicial review of the final decision of Defendant Carolyn W. Colvin, Acting Commissioner of Social Security (the "Commissioner"), which denied Samuel's application for Supplemental Security Income ("SSI") benefits under title XVI of the Social Security Act, 42 U.S.C. § 423 & 1382c. Samuel asserts that the Commissioner's decision is erroneous because the Administrative Law Judge ("ALJ") improperly assessed the medical evidence to determine that Samuel did not meet or equal Listing 11.02 (epilepsy); failed to call a medical advisor to determine if Samuel's seizures medically equaled any Listing, such as Listing 11.02; improperly assessed the credibility of Samuel's treating physician and mother regarding her impairments; and at Step V, failed to account for the claimant's seizures, which could occur without warning and leave her unable to function for several days afterward. Samuel seeks an award of benefits, or remand for proper consideration of the evidence.

## I. BACKGROUND

### A. PROCEDURAL HISTORY

Samuel filed her application for SSI benefits on August 24, 2009. R. at 127-33. Her application was denied initially and upon reconsideration. *Id.* at 62-65, 78-80. She requested a hearing, which was held on May 12, 2011. *Id.* at 34-55. In a decision dated November 16, 2011, an ALJ denied her application. *Id.* at 19-29. Samuels requested a review by the Appeals Counsel, which affirmed the ALJ's decision. *Id.* at 1-5. Samuels promptly filed this appeal on May 9, 2013.

### B. RELEVANT MEDICAL EVIDENCE

#### 1. Treatment Records

In January, 2006, Samuel was evaluated by Dr. Alonso M.D. R. at 326. At the time, Dr. Alonso reported that Samuel had a five-year history of partial complex and secondary generalized tonic clonic seizures, which were treated with Tegretol. *Id.* She reported that she had been to the emergency room with the seizures, which were occurring approximately three to five times per month. *Id.* Samuel did not remember the seizures, but her husband reported that they occurred primarily during the late evening or morning hours. *Id.*

On April 4, 2006, Samuel received an EEG evaluation from Dr. Alonso. *Id.* at 327. He concluded that it was an abnormal EEG due to the presence of intermittent bifrontal sharp and slow wave activity with lateralization to the left frontal hemisphere. *Id.* According to Dr. Alonso, this suggested the presence of an underlying structural lesion involving the anterior portion of the left hemisphere with epileptogenic potential. *Id.*

On August 7, 2008, Samuel received another neurological evaluation by Dr.

Alonso. R. at 328. At that time, Dr. Alonso reported that Samuel was having approximately one seizure per month and she was continuing to take Tregretol. *Id.*

On January 20, 2010, Dr. Alonzo evaluated Samuel again. R. at 328. At that time, Samuel reported that she had several, predominately nocturnal, secondarily generalized tonic clonic seizures. *Id.* She was seen in the Methodist Hospital Emergency Room for treatment and her Tregretol was increased to 200 mg q.i.d. *Id.*

On January 4, 2011, Samuel was evaluated by Dr. Alonzo. R. at 329-30. Dr. Alonzo noted that Samuel continued to have seizures but was amnestic to them; her mother reported them to her. She related that she had been taking her medication as prescribed. An EEG revealed evidence of left frontal sharp wave activity. Dr. Alonzo recommended that Trileptal be substituted for Carbamazepine at 300 mg b.i.d. Her physical exam, however, was normal. *Id.* Dr. Alonzo also restricted Samuel from performing activities such as driving that might put her or others at risk. R. at 239, 313, 330.

### 2. Social Security Administration Consultative Exams & Function Capacity Assessments

In September, 2009, Kenneth Neville, Ph.D. ("Dr. Neville"), a state agency reviewing consultant, completed a psychiatric review. R. at 257-70. Dr. Neville determined that Samuel had no medically determinable impairment. *Id.* at 257.

In October 2009, Joseph Croffie, M.D. ("Dr. Croffie") performed a consultative exam on Samuel. R. at 273-77. Samuel reported to Dr. Croffie that she could walk, stand, and climb without restrictions and lift up to twenty-five pounds. *Id.* at 274. Samuel's physical examination was within normal limits in all areas. *Id.* at 274-75. She exhibited no significant memory impairment. *Id.* at 275.

3

In December 2009, state agency medical expert R. Bond, M.D. ("Dr. Bond"), reviewed Samuel's records and completed a physical capacity assessment. R. at 279-86. Dr. Bond opined that Samuel had no exertional limitations but should avoid exposures to hazards. *Id.* at 280-83.

In February, 2010, state agency reviewing medical expert J. Sands, M.D. ("Dr. Sands"), affirmed Dr. Bond's assessment. *Id.* at 295.

### C. SOCIAL SECURITY REPORTS & HEARING TESTIMONY

On September 4, 2009, Samuel's mother, Eddie Hayes ("Hayes"), completed a functional report to Social Security. R. at 187-88, 191-92. Hayes stated that after Samuel suffered a seizure, she needed help bathing, caring for her hair, and using the toilet. She also needed help or a reminder to take her medicine because she could not remember when she had a seizure. Hayes reported that Samuel had problems getting along with family, friends and neighbors when she had a seizure because she could not remember what she said or did. Hayes also reported that Samuel could not follow a recipe because she could not read and that she had been fired or laid off from a job because of her seizures and memory problems. Hayes opined that Samuel could not handle changes in routine. However, Samuel's activities included doing yard work, riding a bicycle with her children, using public transportation, shopping, playing cards, visiting with friends, and independently caring for her children. R. at 176-80, 186-90, 197.

On September 4, 2009, Hayes also completed a seizure questionnaire report to Social Security. R. at 195-96. She reported that Samuel took Carbamazepine for her seizures, 200 mg, 5 times per day. She had two or three seizures a month, and her last one was on August 31, 2009. Hayes reported that during seizures that she had observed,

Samuel experienced severe convulsions, loss of consciousness, thrashing about, and biting her tongue. Samuel had injured herself during a seizure by biting her tongue and hitting her head. Hayes further reported that Samuel lost bowel or bladder control during a seizure and they occurred both during the day and at night. After a seizure, Samuel would go to sleep for several hours. *Id.*

On September 21, 2009, Social Security interviewed Hayes. R. at 197. Hayes reported that Samuel's memory problems were related to her seizures. When Samuel had a seizure, it could take her up to a day to fully recover her memory. She also had difficulty recalling the date or the day of the week. Hayes reported that she helped Samuel with daily activities to make sure she got everything done. *Id.*

On December 9, 2009, Social Security's Case Development analysis of the evidence stated that "the residual effects of clmt's Sz to seem to interfere severely w/ her daytime functioning." R. at 292.

On May 12, 2011, Samuel appeared with counsel at a hearing regarding her application. R. at 34-55. She testified that she had problems with her memory due to seizures and that she had a seizure approximately once per week. R. at 40. She claimed to have bitten her tongue during a seizure and would sometimes get up and go around the house knocking things over, not knowing what she was doing until someone woke her up. R. at 41.

Samuel testified that she saw Dr. Alonso for treatment of her seizures and that she saw him about every month, but she received no treatment for physical or mental impairments. R. at 40-41. She reported that she took seizure medication four times per day. R. at 43.

5

Samuel stated that she lives with her uncle and two children, ages 10 and 7; she was able to prepare meals for her children, clean house, do laundry, walk for exercise, take her children to the park and listen to music. R. at 47-49. She reported never having a driver's license. Although she had completed twelve years of school, Samuel claimed she could not read or write much more than her name or small words and could not read a newspaper, but she could read a grocery list. R. at 45. Samuels testified that she could not work because she could not spell, read or do math; she reported having pain in her head, legs and back. *Id.* at 46.

One of Samuel's previous employers indicated in a written report that she was a good worker, able to concentrate and understand directions, and that she quit because work was slow. R. at 161-62.

### D. VOCATIONAL EXPERT TESTIMONY

Howard Steinberg ("Steinberg"), a vocational expert, testified at the hearing. R. at 50-54. The ALJ asked Samuel about her background and illuminated that Samuel was thirty-three at the time of the hearing and had no past relevant work. *Id.* at 43 & 50. The ALJ posed a hypothetical to Steinberg:

> Can you assume an individual of the same age, education and work experience as the Claimant? Can you assume this individual has the capacity to occasionally lift and carry 20 pounds, and to frequently lift and carry 10 pounds? The individual ha the unlimited capacity for pushing and pulling up to the capacity for lifting and carrying. The individual has let's say no limitations in climbing, balancing, stooping, kneeling, crouching or crawling, except that the individual has no capacity for climbing ladders or scaffolds. The individual has no limitations in reaching, handling, fingering or feeling.
> The individual has the capacity for less than occasional exposure to workplace hazards, and workplace hazards I'm including are things like unprotected heights, fast-moving machinery. I'm sorry. Machinery with fast-moving parts, and I'm going to include things like large amounts of water, and that would be weather a tub or vat of water, a pond or any kind

6

of water source in that regard, whether it be a pool, a pond, anything like that. The individual has the capacity understand and carry out simple, routine tasks.

The individual has the capacity to appropriately interact with coworkers, supervisors and the general public, and the individual has the capacity to identify and avoid normal workplace hazard and to adapt to routine changes in the workplace. Are there jobs an individual with that profile has the capacity to perform?

R. at 51-52.

Steinberg answered in the affirmative stating that such an individual could perform include hospital cleaner, light, unskilled work (approximately 234,000 jobs in the national economy; 2,200 in Indiana); fast food worker, light unskilled work (273,000 jobs in the national economy; 11,000 in Indiana); office helper, light unskilled (174,000 in the national economy; 1,950 in Indiana); cashier, light unskilled work (1,008,000 in the national economy; 9,500 in Indiana). *Id.* at 52. Steinberg further opined that those or any other jobs would not be sustainable if the individual would require two to four additional breaks of approximately fifteen minutes, which would occur on a regular, but unscheduled basis. *Id.* He also stated that those or any jobs would not be sustainable if the individual would be absent from work, part or full days, such that the absences would total 20% of the time. *Id.* at 52-53.

### E. RELEVANT ASPECTS OF THE ALJ'S DECISION

At Step I, as she stated at the hearing, the ALJ determined that Samuel had not engaged in substantial gainful activity. R. at 24 & 50. At Step II, the ALJ determined that Samuel's "seizure disorder is considered severe because it results in more than minimal functional limitations on her work activities." *Id.* at 24. At Step III, the ALJ opined:

> **3. The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the**

7

> **listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 416.920(d), 416.925 and 416.926).**
>
> I have assessed the claimant's diabetes [sic] under § 11.02 and 11.03 <u>Epilepsy</u>, Appendix 1. To meet the non-convulsive epilepsy listing, 11.03, medical evidence must establish seizures more than once a month while taking prescribed medication for a period of at least 3 months. The medical evidence falls short of the criteria of the section, and no medical source has mentioned findings equivalent in severity to the criteria of any listed impairment, individually or in combination.

R. at 24.

In conjunction with Step IV, the ALJ then determined Samuel's residual functional capacity ("RFC"). R. at 24-27. She set forth her conclusion first, largely tracking the hypothetical she posed to Steinberg at the hearing, *id.* at 24-25; but, she then cited to specific evidence in the record to support her finding. *Id.* at 25-27. Within the discussion, the ALJ stated, "Considering the claimant's subjective complaints regarding intellectual abilities, mentally the claimant has the capacity to understand, remember, and carry out simple, routine tasks." *Id.* at 25. She further elaborated on this conclusion stating that when asked at the hearing why she could not work, Samuel did not mention her seizures and only described limited after effects of loss of focus or a headache that was alleviated with over-the-counter medication. *Id.* The ALJ concluded her assessment of Samuel's credibility with unfortunate boilerplate language:

> After careful consideration of the evidence, I find that the claimant's medically determinable impairment could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not persuasive to the extent they are inconsistent with the above residual functional capacity.

*Id.* Further explanation of this conclusion is found near the end of the RFC discussion. *Id.* at 27.

Also in connection with her discussion of the RFC determination, the ALJ recited all of the medical evidence in the record regarding Samuel's seizures. R. at 25-26. This included reference and analysis of Dr. Alonso's treatment records in January 2010 and January 2011, including the follow-up appointment in the later part of January. *Id.* at 26. At that time, she reported four seizures in the past six months that had been witnessed by her mother, but Samuel did not remember them. *Id.*

The ALJ rejected Dr. Bond's and Dr. Sands' opinions because "they did not adequately consider the claimant's subjective complaints." *Id.* She did, however, give Dr. Neville's significant weight that she had no medically determined impairment because the medical records supported it at the time the opinion was offered and was consistent with the evidence at the time of the hearing. *Id.*

With respect to Hayes' statements, the ALJ stated, "To the extent these statements offer opinions regarding the claimant's ability to perform regular work I give them limited weight as they are not supported by the objective medical evidence." *Id.* at 26-27.

The ALJ also concluded that Samuel's own testimony about her daily activities, including caring for her two children, were inconsistent with Samuel's "subjective complaints and alleged limitations." *Id.* at 27. In addition, the ALJ opined that many of the activities Samuel testified about "require a mental capacity greater than what is required to meet the mental demands of unskilled work." *Id.*

After this analysis, at Step IV, the ALJ again repeated her conclusion that Samuel has no past relevant work. R. at 27.

At Step V, the ALJ considered that Samuel's ability to perform all or substantially all of the requirements of unskilled work was "impeded by additional limitations." R. at

9

28. The ALJ specifically stated, "To determine the extent to which these limitations erode the unskilled light occupational base, I asked the vocational expert whether jobs exist in the national economy for an individual with the claimant's age, education, work experience, and residual function capacity." *Id.* She further recited Steinberg's testimony as set forth above and concluded that Samuel could perform all of the jobs about which he had testified. *Id.* Therefore, the ALJ concluded that Samuel 'is capable of making a successful adjustment to other work that exists in significant numbers in the national economy," and was not disabled. *Id.*

## II. **STANDARD**

To be eligible for DIB, a claimant must have a disability under 42 U.S.C. § 423. "Disability" means the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment that has lasted or can be expected to last for a continuous period of not less than twelve months. 42 U.S.C. § 423 (d)(1)(A). To determine whether or not a claimant is disabled, the ALJ applies a five-step process set forth in 20 C.F.R. § 404.1520(a)(4):

I. If the claimant is employed in substantial gainful activity, the claimant is not disabled.

II. If the claimant does not have a severe medically determinable physical or mental impairment or combination of impairments that meets the duration requirement, the claimant is not disabled.

III. If the claimant has an impairment that meets or is equal to an impairment listed in the appendix to this section and satisfies the duration requirement, the claimant is disabled.

IV. If the claimant can still perform the claimant's past relevant work given the claimant's residual functional capacity, the claimant is not disabled.

V. If the claimant can perform other work given the claimant's residual

10

> functional capacity, age, education, and experience, the claimant is not disabled.

The burden of proof is on the claimant for the first four steps, but then it shifts to the Commissioner at the fifth step. *See Young v. Sec'y of Health & Human Servs.*, 957 F.2d 386, 389 (7th Cir. 1992).

The Social Security Act, specifically 42 U.S.C. § 405(g), provides for judicial review of the Commissioner's denial of benefits. When the Appeals Council denies review of the ALJ's findings, the ALJ's findings become findings of the Commissioner. *See Craft v. Astrue*, 539 F.3d 668, 673 (7th Cir. 2008); *Hendersen v. Apfel*, 179 F.3d 507, 512 (7th Cir. 1999). This Court will sustain the ALJ's findings if they are supported by substantial evidence. 42 U.S.C. § 405(g); *Craft*, 539 F.3d at 673; *Nelson v. Apfel*, 131 F.3d 1228, 1234 (7th Cir. 1999). "Substantial evidence is 'such evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Craft*, 539 F.3d at 673 (quoting *Barnett v. Barnhart*, 381 F.3d 664, 668 (7th Cir. 2004)). In reviewing the ALJ's findings, the Court may not decide the facts anew, reweigh the evidence, or substitute its judgment for that of the ALJ. *Nelson*, 131 F.3d at 1234.

The ALJ "need not evaluate in writing every piece of testimony and evidence submitted." *Carlson v. Shalala*, 999 F.2d 180, 181 (7th Cir. 1993). However, the "ALJ's decision must be based upon consideration of all the relevant evidence." *Herron v. Shalala*, 19 F.3d 329, 333 (7th Cir. 1994). *See also*, *Craft*, 539 F.3d at 673. Further, "[a]n ALJ may not discuss only that evidence that favors his ultimate conclusion, but must articulate, at some minimum level, his analysis of the evidence to allow the [Court] to trace the path of [her] reasoning." *Diaz*, 55 F.3d at 307. *See also*, *Craft*, 539 F.3d at 673 (stating that not all evidence needs to be mentioned, but the ALJ "must provide an

'accurate and logical bridge' between the evidence and the conclusion" (quoting *Young v. Barnhart*, 362 F.3d 995, 1002 (7th Cir. 2004))). An ALJ's articulation of her analysis enables the Court to "assess the validity of the agency's ultimate findings and afford [the] claimant meaningful judicial review." *Craft*, 539 F.3d at 673.

## III. ANALYSIS

### A. LISTING DETERMINATION & MEDICAL EXPERT TESTIMONY

Samuel contends that the ALJ improperly relied upon several factors that are not relevant to Listing 11.02 when she determined that Samuel neither met nor equaled the Listing. Dkt. No. 28 at 4-5. Rather, Samuel believes that the ALJ ignored evidence that Samuel met the Listing including, among other things, Samuel's seizure diary and Hayes' reports of the frequency of Samuel's seizures in 2009. *Id.* at 3-5. Samuel also claims that the ALJ erred by not calling an expert neurologist to testify about whether or not Samuel's seizures medically equaled Listing 11.02. Dkt. No. 22 at 14-16.

The Commissioner argues that Samuel failed to meet her burden to prove through documented evidence that her seizure pattern met the standard of occurrence "more frequently than once a month in spite of at least 3 months of prescribed treatment." Dkt. No. 27 at 6-7. The Commissioner further asserts that the ALJ considered the entirety of the record and the failure to specifically cite to every piece of evidence is not required. *Id.* at 7-9, 11-12. She also states that the ALJ relied on medical evidence from Dr. Neville to determine that Samuel's impairments did not equal Listing 11.02. *Id.* at 9-10.

The Court concludes that the ALJ reasonably assessed the medical evidence in the record to conclude that Samuel's condition neither met nor equaled Listing 11.02. Contrary to Samuel's assertion, the ALJ relied upon all of the medical records Samuel

provided about the effects of her seizures on her physical and mental well-being as well as the medical opinion of Dr. Neville to form her conclusion.  Although the finding section of the ALJ's opinion is rather short, it is clear from her assessment of the Samuel's RFC that she carefully considered the medical evidence presented.  R. at 25-27.  The ALJ even rejected the state agency consultative reports because they did not adequately consider Samuel's subjective complaints.  R. at 26.

The objective medical evidence in the record simply did not support Hayes' 2009 report of more frequent seizures and Samuel's seizure diary standing alone is not objective medical evidence.  Samuel presented no reason that she was prevented from presenting additional medical evidence that her seizure pattern changed significantly after her January 2011 visits to Dr. Alonso.  Further, the ALJ reasonably determined that she had enough evidence upon which to base her decision and there was no need to obtain additional medical testimony, particularly in light of the fact that the ALJ did consider the most recent medical evidence presented.  *See Skinner v. Astrue*, 478 F.3d 836, 844 (7th Cir. 2007) (stating that an "ALJ is not *required* to order [a consultative examination], but may do so if an applicant's medical evidence about a claimed impairment is insufficient") (emphasis in original) (citing 20 C.F.R. §§ 416.912(f), 416.917).  Based on the record before this Court, the ALJ's decision that Samuel's seizures did not meet or equal Listing 11.02 is supported by substantial evidence and it was not an error that the ALJ did not call another medical expert to examine Samuel.

### B. CREDIBILITY DETERMINATIONS

Throughout her brief in support of her appeal, Samuel challenges the ALJ's credibility determinations.  Dkt. No. 22 at 9-12 (Hayes; Social Security Case Development

analysis; Samuel); 17-20 (neurological examinations; Hayes). More specifically, Samuel argues that the ALJ erred by not giving specific reasons that she found Hayes and Hayes' reports to the Social Security Administration not credible. *Id.* at 9-10. Similarly, Samuel claims that the ALJ did not articulate her reasons for finding Samuel not credible and determined Samuel's RFC prior to assessing credibility. *Id.* at 11-12; 17-20. Samuel rejects the ALJ's analysis because it did not follow Social Security Ruling 96-7p ("SSR 96-7p"). *Id.* at 17-20. Samuel states that the ALJ's use of boilerplate language was not harmless. Dkt. No. 28 at 7.

The Commissioner asserts that, while SSR 96-7p "provides factors for an ALJ to consider in her credibility analysis, an ALJ is not required to analyze every factor." Dkt. No. 27 at 12. The Commissioner defends the ALJ's analysis arguing that the summary of her finding was not the totality of the analysis in which the ALJ considered multiple factors that led to her conclusion. *Id.* at 12-13 (citing. at 25-27). In total, the Commissioner argues, the ALJ adequately supported her credibility determination and it was not patently wrong. *Id.* at 13-14.

The Court concludes that the ALJ adequately supported her credibility determinations. The Court will not disturb a credibility determination unless it is unreasonable or unsupported. *See Pepper v. Colvin*, 712 F.3d 351, 367-68 (7th Cir. 2013) (discussing the requirement that an ALJ explain his or her reasoning, but reviewing courts rarely disturb those findings) (citing, *inter alia*, *Getch v. Astrue*, 539 F.3d 473, 483 (7th Cir. 2008)). With respect to the ALJ's rejection of Hayes' reports, the ALJ specifically stated that Hayes' opinions were not supported by the objective medical evidence in the record. R. at 26-27. There was nothing patently wrong with this analysis. Moreover, with respect

to the Social Security Case Development comment, the quoted passage merely identified a question that the agency had for Dr. Bond.  R. at 292-93.  Therefore, the ALJ did not need to consider the information as binding because Dr. Bond made his own assessment, which the ALJ considered in her analysis.  R. at 25-26.

With respect to the ALJ's assessment of Samuel's credibility, although the ALJ used the unfortunate boilerplate language for her conclusion, she adequately explained the reasons for her rejection of Samuel's assessment of her capabilities.  First, "the simple fact that an ALJ used boilerplate language does not automatically undermine or discredit the ALJ's ultimate conclusion if [s]he otherwise points to information that justifies [her] credibility determination."  *Pepper*, 712 at 367-68.  The ALJ carefully assessed all of the evidence in the record regarding Samuel's daily life activities and the medical evidence regarding Samuel's physical and mental impairments.  R. at 25-27.  She even rejected the totality of Dr. Bond's and Dr. Sands' opinions because "they did not adequately consider the claimant's subject complaints."  Most significantly, the ALJ pointed to the inconsistency of Samuel's testimony with her allegations that she could not work stating, "When asked at the hearing as to why she is unable to work, the claimant stated that it was because she has difficulty reading and with math.  I note that the claimant did not mention her seizure disorder when asked why she could not maintain regular work."  R. at 27.  The ALJ then contrasted this testimony with Samuel's testimony regarding the multiple complex tasks she undertook on a daily basis to care for herself and her two young children.  *Id.*  With this thorough discussion of the medical evidence and the hearing testimony the ALJ more than adequately justified her credibility determination.

## C. STEP V DETERMINATION

Samuel contends that the ALJ erred at Step V when she determined that Samuel was not disabled because she could perform some jobs. Specifically, she challenges the ALJ's RFC determination that failed to account for the possibility of at-work seizures and the resultant confusion and/or headaches thereafter. Dkt. No. 22, at 21. Samuel argues that that the limitation to simple, routine and unskilled work could not account for the impact a seizure would have on Samuel's ability to work. *Id.* at 21-22. Samuel also asserts that the ALJ's RFC evaluation failed to consider the agency's comments that her seizures interfered with Samuel's ability to work and did not account for Samuel's mental impairments. Dkt. No. 28 at 8.

The Commissioner responds that Samuel's argument on the ALJ's RFC determination mirrors her arguments before that the conclusion is unsupported by the record. Dkt. No. 27 at 15. It too, fails, the Commissioner contends because the ALJ's RFC determination was supported by substantial evidence in the record and all of Samuel's evidenced impairments were included in the hypothetical presented to Steinberg. *Id.* at 15-16. Further, the Commissioner states that there was no evidence in the record that Samuel had any mental impairments that would preclude a conclusion that Samuel could perform light, unskilled work as reflected by the ALJ's determination of Samuel's RFC. *Id.* at 16.

The Court concludes that substantial evidence supports the ALJ's conclusions regarding Samuel's RFC and there was no reversible error in the ALJ's hypothetical or her determination that there were jobs in the national economy that Samuel could perform. The Court has already concluded that the ALJ properly assessed the Samuel's

credibility and reasonably supported her RFC determination with the objective medical evidence in the record. Therefore, to the extent Samuel seeks to challenge those conclusions again here with respect to the hypothetical that the ALJ posed to Steinberg, the Court rejects it for the same reasons stated above.

Given a properly determined RFC, the ALJ then assessed whether or not there were jobs in the national economy that Samuel could perform. She relied exclusively on Steinberg's testimony and his interpretation of the ALJ's RFC in making her determination. *Compare* R. at 51-52 *with* R. at 28 (adopting Steinberg's testimony as her findings). Although the Court may disagree with the breadth and complexity of some of the jobs Steinberg and the ALJ concluded Samuel could perform (cashier for example), the Court will not reweigh the evidence and there is no reason to question that there were plenty of other light and unskilled jobs available that the ALJ could have relied upon alone to conclude that Samuel was not disabled. R. at 28 (listing hospital cleaner, fast food worker, and office helper as other jobs that Samuel could perform). In fact, at least two of these jobs, hospital cleaner and fast food worker, were similar in nature to the daily work Samuel testified that she performed at home.

Because the ALJ's underlying RFC determination is supported by substantial evidence and the hypothetical she presented to Steinberg tracked that RFC nearly word for word, the Court concludes that the ALJ did not err at Step V when she determined that there were jobs in the national economy that Samuel could perform and, therefore, she is not disabled.

## IV. **CONCLUSION**

For the reasons stated herein, the decision of the Defendant, Carolyn W. Colvin, Acting Commissioner of Social Security, is **AFFIRMED**. Judgment shall be entered accordingly.

IT IS SO ORDERED this 28th day of August, 2014.

_____
LARRY J. McKINNEY, JUDGE
United States District Court
Southern District of Indiana

Distribution:

Patrick Harold Mulvany
patrick@mulvanylaw.com

Thomas E. Kieper
UNITED STATES ATTORNEY'S OFFICE
tom.kieper@usdoj.gov